Brigham Ricks
145 Carolina Forest Road
Chapel Hill, NC 27516
(805) 705-8038

In Pro Per

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT ERINGER, an individual, | Case No.: 2:15-cv-09750-PSG (JEMx) |
| Plaintiff, | [Superior Court of California, County of Santa Barbara, Anacapa Division, Case No. 15CV03986] |
| vs. | **DEFENDANT'S NOTICE AND MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, IMPROPER VENUE, AND FAILURE TO STATE A CAUSE OF ACTION UPON WHICH RELIEF CAN BE GRANTED** |
| BRIGHAM JOEL RICKS and DOES 1 though 10, Inclusive | |
| Defendants. | |
| | Date: March 14, 2015 |
| | Time: 1:30 |
| | Courtroom: 880 - Roybal |
| | Judge: Philip S. Gutiérrez |

## NOTICE OF MOTION

In accordance with Federal Rule of Civil Procedure 12(b) subsections (2), (3), and (6) as well as Title 28 of the United States Code section 1404(a), Defendant Brigham Ricks ("Ricks") hereby moves for the dismissal of this case

against him as he is not the proper party and he is not subject to the personal jurisdiction of this Court or, alternatively, that this case be transferred to the United States District Court for the Northern District of West Virginia, the proper judicial district. The alternative motions are supported by the simultaneously-filed Memorandum of Points and Authorities as well as the referenced exhibits. As explained therein, Ricks is an improper party over which this Court lacks personal jurisdiction; thus, dismissal and/or removal of the matter is warranted.   In addition, the Complaint has been brought in an improper venue and fails to states a cause of action upon which relief can be granted.

The motion will be heard before Judge Philip S. Gutierrez on March 14, 2015 at 1:30 in Courtroom 880 located at 255 East Temple Street, Los Angeles, CA 90012.

PLEASE TAKE NOTICE that a conference of counsel pursuant Local Rule 7-3 did not take place due the Christmas vacations and the shortened time to file this motion after removal.

RESPECTFULLY submitted this 29th day of December 2015.


_____

Brigham J. Ricks


-2-

MOTION TO DISMISS

## MEMORANDUM OF POINTS AND AUTHORITIES

## ARGUMENT

### I. THE COMPLAINT IN ITS CURRENT FORM DOES NOT SET FORTH ANY BASIS FOR ATTRIBUTING PERSONAL LIABILITY TO RICKS AND FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

The complaint alleges that Ricks represented Eringer in negotiating and drafting agreements with Allied Energy, Inc. to make investments in wells known as the Valentine #3 and Valentine #6 (see Complaint, Dkt. 1 at pg. 16, para. 12 and 14). While reference to these agreements is made in the complaint, Plaintiff does not attach them. Attached hereto as Exhibits A-D are the agreements referenced in the complaint with Allied Energy, Inc. for the Valentine #3 and Valentine #6 wells (see Declaration of Brigham Ricks at para. 1):

• Exhibit A: Participation Agreement for the Valentine #3. The agreement is between Allied Energy, Inc. and Valentine #3, GP.

• Exhibit B: Joint Operating Agreement for the Valentine #3. The agreement is between Allied Energy, Inc. and Valentine #3, GP.

• Exhibit C: Participation Agreement for the Valentine #6. The agreement is between Allied Energy, Inc. and Eringer Family Trust U/D/T 3/19/2010.

• Exhibit D: Joint Operating Agreement for the Valentine #6. The agreement is between Allied Energy, Inc. and Eringer Family Trust U/D/T 3/19/2010.

MOTION TO DISMISS

The Plaintiff, Robert Eringer, is not a party to any of the agreements he alleges Ricks negotiated and drafted on his behalf with Allied Energy, Inc.  Since Eringer is not a party to these agreements, Ricks cannot have personal liability to Eringer related to these agreements.

Ricks is not a proper party and must be dismissed.   In addition, since Eringer is not a party to the agreements, he fails to state a cause of action upon which relief can be granted against Ricks.  Federal Rule of Civil Procedure 12(b)(6).

## II. COURT LACKS PERSONAL JURISDICTION OVER RICKS

Ricks is a current resident of Chapel Hill, North Carolina and has resided in North Carolina since September 2011. (See Notice of Removal, Dkt. 1 at pg. 3, Para. 9)   His sole residence and office is maintained in Chapel Hill, North Carolina and his professional and business activities are conducted in the State of North Carolina. (See Declaration of Brigham Ricks at para. 2) He does not own or lease, in whole or part, any real property in the State of California.  (*Id.*)

The complaint does not allege any facts that Ricks enter California as part of the alleged transactions, negotiated or drafted documents related to the transactions in California, performed legal services in California or signed any documents in California.  The agreements attached as Exhibits A-D show that the contracting party, Allied Energy, Inc., is a West Virginia corporation, that the Valentine #3 and Valentine #6 wells are located in West Virginia, and that

-4-
MOTION TO DISMISS

jurisdiction for any disputes be in West Virginia.

When a nonresident defendant timely challenges the existence of personal jurisdiction and the appropriateness of the selected venue, the plaintiff bears the burden of proving that the Court, in fact, does have personal jurisdiction over the nonresident defendant and that the chosen venue is proper. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989); *Asco Healthcare v. Heart of Texas Health Care*, 540 F.Supp.2d 634, 640-41 (D. Md. 2008); *Ottenheimer Publishers Inc. v. Playmore, Inc.*, 158 F.Supp.2d 649 (D. Md. 2001). To satisfy this burden, the plaintiff must present facts sufficient to establish a prima facie case of personal jurisdiction and proper venue. *Id*. If the allegations in the complaint are controverted by the affidavit or other evidence provided by the defense, the factual assertions of the defense prevail, unless the plaintiff provides conflicting evidence to support the allegations of the complaint. *Travelers Indem. Co. v. Calvert Fire Ins. Co.*, 798 F.2d 826, 831 (5th Cir. 1986); *Brown v. Flowers Industries, Inc.*, 688 F.2d 328, 332 (5th Cir. 1982)).

The California District Court may assert personal jurisdiction over a nonresident defendant only to the extent allowed under the state's long-arm statute. Fed. R. Civ. P. 4(k); To establish personal jurisdiction over a nonresident defendant, a plaintiff ***must*** identify a specific California statutory provision authorizing jurisdiction. The Complaint, in this matter, fails to identify a specific California statute as to personal jurisdiction. (See Complaint, Dkt. 1 at pg. 14,

-5-

MOTION TO DISMISS

para. 6).

Neither specific nor general jurisdiction is present in this case and dismissal is warranted under Federal Rule of Civil Procedure 12(b)(2).

### III. THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA IS THE IMPROPER VENUE FOR THIS ACTION

With respect to venue, the Plaintiff claims that "Venue in this Court is proper as all agreements referred to herein were negotiated and executed in Santa Barbara County and a significant portion of the events giving rise to this action occurred in Santa Barbara County." (See Complaint, Dkt. 1, pg. 14, para. 6)

The general venue statute, in pertinent part, provides that a "civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought." 28 U.S.C. § 1391(b); *see also* 28 U.S.C. § 1400(a) ("Civil actions, suits, or proceedings under any Act of Congress relating to copyrights or exclusive rights in mask works or designs may be instituted in the district in which the defendant or his agent resides or may

be found.") There is no factual or legal basis for venue in the United States District Court for the Central District of California.

Ricks resides and works in the State of North Carolina and did not conduct any business in California related to the actionable transactions described in the Complaint (see Declaration of Brigham Ricks).  The transactions are alleged to have occurred with Allied Energy, Inc., a West Virginia corporation, concerning wells known as the Valentine #3 and #6 located in West Virginia, and the agreements state jurisdiction shall be West Virginia (see Exhibits A-D)  If any tort was committed by Ricks, it was committed, in large part, in North Carolina, the physical location Ricks' residence and office, or West Virginia, where the agreements with Allied Energy, Inc. were carried out. Ricks neither resides in California nor "may be found" in California. Venue in a California district court under 28 U.S.C. §§ 1391 and 1400(a) is improper and cannot be sustained; therefore, the complaint should be dismissed for lack of venue or should be transferred to West Virginia under 28 U.S.C. § 1404.

West Virginia is a proper venue because the plaintiff agreed to have jurisdiction in that state, the wells are located in that state, the contracting party Allied Energy, Inc. is located in that state, and the personnel, contractors and records of Allied Energy, Inc., which will be key witnesses and evidence at trial, are located in that state.

MOTION TO DISMISS

## CONCLUSION

For these reasons, Defendant Brigham Ricks hereby moves for the dismissal of this case against him as he is not the proper party, plaintiff has failed to state a cause of action upon which relief can be granted against him and he is not subject to the personal jurisdiction of this Court or, alternatively, that this case be transferred to the United States District Court for the Northern District of West Virginia, the proper judicial district.

RESPECTFULLY submitted this 29th Day of December, 2015.


_____
Brigham J. Ricks

# DECLARATION OF BRIGHAM J. RICKS

I, BRIGHAM J. RICKS, declare:

I am the defendant in the underlying lawsuit.  I am personally apprised of the facts stated herein.

1. Attached as Exhibits, A, B, C and D the agreements referenced in the complaint which plaintiffs alleges I negotiated and drafted on his behalf.

• Exhibit A: Participation Agreement for the Valentine #3.  The agreement is between Allied Energy, Inc. and Valentine #3, GP.

• Exhibit B: Joint Operating Agreement for the Valentine #3.    The agreement is between Allied Energy, Inc. and Valentine #3, GP.

• Exhibit C: Participation Agreement for the Valentine #6.  The agreement is between Allied Energy, Inc. and Eringer Family Trust U/D/T 3/19/2010.

• Exhibit D: Joint Operating Agreement for the Valentine #6.    The agreement is between Allied Energy, Inc. and Eringer Family Trust U/D/T 3/19/2010.

2. My sole residence and office are located in the State of North Carolina.  I do not own or lease in whole or in part, any real property in California.

3. I did not conduct any business in California related to agreements between Allied Energy, Inc. and the plaintiff, Robert Eringer.

I declare under penalty of perjury that the foregoing is true and correct, and I have executed this declaration in Chapel Hill, North Carolina this 29th day of December, 2015.

/s/_____
Brigham Ricks

-9-

MOTION TO DISMISS

# EXHIBIT A

Allied Energy, Inc.
Route 1, Box 30-A
Petroleum, West Virginia 26161
Phone:  (304) 628-3672

September 25, 2013

To:  Valentine #3, GP

       Re:     Participation Agreement

Dear Valentine #3, GP:

       When properly executed by you, this Participation Agreement will evidence the
agreement made and entered into between Allied Energy, Inc., a West Virginia corporation,
hereinafter referred to as "ALLIED", and you, hereinafter referred to as "Participant", setting
forth the terms and conditions under which ALLIED has agreed to sell and assign to Participant,
subject to the burdens and reservations outlined below, an undivided 50% working interest in the
new well as known as the Valentine #3 located on the Florence Valentine Lease in Ritchie
County, West Virginia, API #47-8509965 (the "Prospect").

       I.       **Participant Interest Acquisition**:   Enclosed herewith, ALLIED has submitted
invoices for the Authority For Expenditure ("AFE") costs for drilling, hydraulic fracturing and
equipping for production ("Drilling and Completion Costs") attributed to this Prospect in the
amount of $288,000.00 as specified per the the AFE.   Participant shall pay to ALLIED (the
"Operator") upon execution of this Agreement an amount of $294,000.00 to earn in the Prospect
a working interest of 50% and net revenue interest of 40.62% (50 x 81.25%).

       All other costs after those costs covered by the AFE shall be borne proportionately by
ALLIED and Participant.

       II.      **New Well**:  ALLIED and Participant have agreed to drill one new well, known as
the Valentine #3, to a depth of approximately 4,000 feet within the boundaries of the Florence
Valentine Lease in Ritchie County, West Virginia, in accordance with the terms and conditions
herein.

       Operator hereby agrees to commence, or cause to be commenced, operations for the new
well as soon as practical after all funds have been received but no later than thirty (30) days after
execution of this Agreement; and once operations are commenced, to prosecute the same with
due diligence and in a good and workmanlike manner to a depth as the joint owners may deem
necessary to adequately test the previously mentioned formations.   Such well shall be evaluated
in accordance with reasonable and prudent Operator standards.    Operator will manage all

engineering services, including drilling and work over rigs, logging, cementing, perforating and any testing of the well drilled on the Prospect.

      III.    **Well Information**:  Operator shall furnish regular reports by telephone, fax or e-mail advising of the shows of oil and/or gas encountered and the results of all testing and completion operations. ALLIED shall furnish Participant with sufficient notice prior to the running of any logs, or tests so that Participant and/or its agents may be present for such operations, if Participant so desires.  Additionally, Operator shall furnish Participant one (1) copy of all logs, and one (1) copy of test results, test charts, and West Virginia Department of Mines Oil and Gas Division forms and reports filed in connection with the drilling and completion or plugging and abandonment of the Valentine #3 well.

      IV.    **Operating Agreement**:  Except as otherwise set forth herein, the rights and obligations agreed to by ALLIED and Participant and all operations shall be governed and controlled by the Joint Operating Agreement in which ALLIED is to be designated as the Operator.  In the event of a conflict between this Participation Agreement and the Joint Operating Agreement, the provisions of this Participation Agreement shall prevail.  Notwithstanding anything to the contrary in the Joint Operating Agreement, the Operator shall market and sell the oil and gas production from the Valentine #3 well on a best price/best terms basis on behalf of itself and the Participant.  Operator on behalf of the Participant shall be responsible for the payment of all royalties, overriding royalties, and other burdens due on the Participant's share of the oil and gas production from the such wells.

      V.    **Assignment**:  Simultaneously with the Participant paying the Drilling and Completion Costs, ALLIED shall assign to Participant 50% interest in the Prospect.  Participant will be delivered a 40.62% net revenue interest in the unit.

      VI.    **Land and Legal**:  Any additional run sheets, title opinions, leases, brokerage fees, and outside attorney's fees incurred and required to secure clear title prior to the drilling of the Valentine #3 well shall be billed to the joint account.

      VII.    **Notices**:  All notices, reports and other communications required or necessary by the terms of this Agreement shall be deemed served and addressed if sent by regular mail, overnight express mail, fax, delivery in person or courier service at the addresses stated herein below.  Either party may change addresses by giving prior written notice to the other.  Until further notice, the addresses of the parties to this Agreement are as follows:

             Allied Energy, Inc.
             Jon M. Makeever
             P.O. Box 3005
             Saratoga, California 95070
             Phone:  (310) 710-1976
             WV Office:  (304) 628-3672
             E-mail:  jmm@alliedenergywv.com

Valentine #3, GP
℅ Robert Eringer
1187 Coast Village Road, Suite 1-300
Santa Barbara CA 93108
Phone: (805) 455-5458
E-mail: eringer33@aol.com

VIII.   **Miscellaneous Provisions**:

1.      Participant acknowledges that any and all interest in the Prospect acquired by it hereunder is taken subject to royalties of 18.76% and severance tax of 5%.

2.      ALLIED will indemnify, defend and hold harmless Participant from liability resulting from any claim of personal injury or environmental damage at the Valentine #3 well. Additionally, ALLIED will indemnify, defend and hold harmless Participant from paying in excess of $1,000.00 for any annual operating, maintenance and/or improvement expenses to the Valentine #3 well that exceed its net annual revenues.

3.      If the Valentine #3 well is sold to a third party, Participant will receive from a net sales price a payment in the amount equivalent to their working interest percentage in the Valentine #3 well.

4.      The Participant will not be liable for additional costs beyond the AFE for initial drilling and completion of the Valentine #3 well.

5.      Participant specifically assumes its proportionate share of the risk of description, title, and the condition of the Lease.

6.      This Participation Agreement shall be considered effective upon the execution by both parties of this instrument.   Upon the execution of this Agreement, Participant will be deemed to have assumed and agreed to bear its proportionate share of the duties and obligations set forth in the Operating Agreement.

7.      This Agreement shall not create any mining partnership, commercial partnership, or other partnership, relationship or joint venture, and the responsibilities of each of the parties hereto shall be several and not joint.

8.      This Agreement is entered into in the State of West Virginia, and all matters relating to the validity, construction, interpretation and performance hereunder shall be determined in accordance with the laws of the State of West Virginia.  Venue for any cause of action of whatsoever nature arising hereunder is hereby fixed in Ritchie County, West Virginia.

9.      The provisions hereof shall extend to and be binding upon the parties hereto, their respective successors and assigns, and any transfer or assignment of the interests hereunder shall be expressly subject to the terms and provisions of this Agreement.

       If this Agreement correctly states your understanding of our agreement, please signify your acceptance and approval by executing and returning it.

Sincerely,

ALLIED ENERGY, INC.


By:     _____
            Jon M. Makeever, President



ACCEPTED AND AGREED


By:     _____       _____
            Robert Eringer, Managing Partner       Date
            Valentine #3, GP

# EXHIBIT B

## JOINT OPERATING AGREEMENT

### DATED: September 25, 2013

OPERATOR: Allied Energy, Inc., a West Virginia corporation

CONTRACT AREA:  New Well Valentine #3 (API #47-8509965)

COUNTY OF RITCHIE, STATE OF WEST VIRGINIA

### OPERATING AGREEMENT

THIS AGREEMENT, entered into by Allied Energy, Inc., a West Virginia corporation, hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

### WITNESSETH:

WHEREAS, the Operator is owner of Oil and Gas leases and/or Oil and Gas Interests known as the Florence Valentine Lease located in Richie County, West Virginia and the parties hereto have reached an agreement to explore and develop an Oil and Gas well known as the Valentine #3 described in Exhibit A for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.

### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas wells intended to be developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas wells are described in Exhibit "A."

D. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

E. The term "Oil and Gas Interests" or "Interests" shall mean unleased mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement.

F. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

## ARTICLE II.

## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

A. Exhibit "A," shall include the following information:

(1) Description of lands subject to this agreement,

(2) Restrictions, if any, as to depths, formations, or substances,

(3) Parties to agreement with addresses and telephone numbers for notice purposes,

(4) Percentages or fractional interests of parties to this agreement,

(5) Oil and Gas wells subject to this agreement,

(6) Burdens on production.

B. Exhibit "B," INTENTIONALLY OMITTED

C. Exhibit "C," Accounting Procedure.

D. Exhibit "D," Insurance.

## ARTICLE III.

## INTERESTS OF PARTIES

A. Interests of Parties in Costs and Production:

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, Operator on behalf of all parties shall pay or deliver, or cause to be paid or delivered, all burdens on the production from the Contract Area up to, but not in excess of, 18.75% and shall indemnify, defend and hold the other parties free from any liability therefor. Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden.

## ARTICLE IV.

## TITLES

A. Title Examination:

Title examination shall be made on the proposed Valentine #3 wellsite prior to commencement of drilling operations. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments. Each party contributing Oil and Gas Interests to be included in the Contract Area, if appropriate, shall furnish to Operator all abstracts, title opinions, title papers and curative material in its possession

free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Copies of all title opinions shall be furnished to each party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the parties in the proportion of each party's working interest.

No well shall be drilled on the Contract Area until after (1) the title to the Contract Area, if appropriate, has been examined as above provided, and (2) the title has been accepted by all of the Drilling Parties in such well.

B. Loss or Failure of Title:

Losses: All losses of Oil and Gas leases or Interests committed to this agreement shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

## ARTICLE V.

## OPERATOR

A. Designation and Responsibilities of Operator:

Allied Energy, Inc. shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

B. Resignation or Removal of Operator and Selection of Successor:

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after

excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

    3. Effect of Bankruptcy:   If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non- Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

C. Employees and Contractors:

    The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

D. Rights and Duties of Operator:

    1. Competitive Rates and Use of Affiliates:   The well drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

    2. Discharge of Joint Account Obligations:   Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C."   Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

    3. Protection from Liens:  Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

    4. Custody of Funds:  Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

    5. Access to Contract Area and Records:  Operator shall, except as otherwise provided herein, permit each Non-

Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. Filing and Furnishing Governmental Reports:  Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary for Operator to make such filings.

7. Drilling and Testing Operations:   The following provisions shall apply to the well drilled hereunder, including:
    (a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which drilling operations are commenced.
    (b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.
    (c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates.   Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance:  At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self- insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C."   Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

## ARTICLE VI.

## DRILLING AND DEVELOPMENT

A. Drilling of Valentine #3 Well:

On or before August 16, 2013, Operator shall commence the drilling of the Valentine #3.

B. Other Operations:

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of

Twenty-five Thousand Dollars ($25,000.00) except in connection with the drilling of the Valentine #3 well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of Twenty-five Thousand Dollars ($25,000.00). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as salt water disposal wells or to conduct additional work with respect to the Valentine #3 well drilled hereunder or other similar project reasonably estimated to require an expenditure in excess of Twenty-five Thousand Dollars ($25,000.00).   Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least 51% of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

C. Abandonment of Wells:

   1. Abandonment of Dry Hole:  Any well which has been drilled under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within seventy-two (72) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within forty- eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

   2. Abandonment of Well That Has Produced:  Any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle Operator to retain or take possession of such well and plug and abandon the well.

   Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the wellbore of the

well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the interest of the abandoning party is or includes an Oil and Gas Interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B."  The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

F. Termination of Operations:

Upon the commencement of an operation for the drilling, testing, Completion or plugging of the Valentine #3 well, such operation shall not be terminated without consent of parties bearing 51% of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition and the provisions of Article VI.C. shall thereafter apply to such operation, as appropriate.

## ARTICLE VII.

### EXPENDITURES AND LIABILITY OF PARTIES

A. Liability of Parties:

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. No party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

B. Liens:

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

C. Advances: INTENTIONALLY OMITTED

D. Taxes:

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

**ARTICLE VIII.**

**ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

A. Cash Contributions:

While this agreement is in force, any contribution of cash towards the drilling of a well or any other operation on the Contract Area shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation.

B. Assignment; Maintenance of Uniform Interest:

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

E. Waiver of Rights to Partition:

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

**ARTICLE IX.**

**INTERNAL REVENUE CODE ELECTION**

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership,

and if the parties have not otherwise agreed to form a tax partnership, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulations § 1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

## ARTICLE X.

## CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed Twenty-five Thousand Dollars ($25,000.00) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.

## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.

## NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, facsimile, e-mail, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A."

All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, the facsimile machine of such party or when email is sent by sender. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or upon transmittal by facsimile or e-mail, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, facsimile or e-mail within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

## ARTICLE XIII.

### TERM OF AGREEMENT

This agreement shall remain in full force and effect until the Valentine #3 well is abandoned pursuant to Article VI.C.

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.

### COMPLIANCE WITH LAWS AND REGULATIONS

A. Laws, Regulations and Orders:

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

B. Governing Law:

This agreement and all matters pertaining hereto, including but not limited to matters of performance, nonperformance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of West Virginia shall govern.

C. Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or

application was made in good faith and does not constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

## ARTICLE XV.

## MISCELLANEOUS

A. Execution:

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Valentine #3 well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Valentine #3 well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds with drilling operations for the Valentine #3 well without the execution hereof by all persons listed on Exhibit "A" as having a current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the Initial Well which would have been charged to such person under this agreement if such person had executed the same and Operator shall receive all revenues which would have been received by such person under this agreement if such person had executed the same.

B. Successors and Assigns:

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

C. Counterparts:

This agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts together constitute only one and the same instrument. Delivery of a counterpart may be made by electronic signature, facsimile transmission or scan and email of a signed copy of this agreement, which transmission shall have the same force and effect as the delivery of an executed original of the agreement. Notwithstanding the foregoing, upon request the parties shall execute and deliver executed copies of this agreement so that each signatory hereof will have a duplicate original executed by the other signatory or signatories.

D. Interpretation:

The terms of this agreement have been negotiated by the parties hereto and the language used in this agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent.  This agreement shall be construed without regard to any presumption or rule requiring construction against the party causing such instrument or any portion thereof to be drafted, or in favor of the party receiving a particular benefit under the agreement.  No rule of strict construction will be applied against any person.

E. Entire Agreement

This agreement, along with the attached exhibits and simultaneously executed Participation Agreement is the entire agreement between the parties with respect to the transaction contemplated herein. It replaces and supersedes any and all oral agreements between the parties, as well as any prior writings.  Neither this agreement nor any provision hereof may be waived, modified, amended, discharged, or terminated except by an instrument in writing signed by the party against which the enforcement of such waiver, modification, amendment, discharge or

termination is sought, and then only to the extent set forth in such instrument.

F. Severability:

     For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

     IN WITNESS WHEREOF, this agreement shall be effective as of September 25, 2013.

ATTEST OR WITNESS:

**OPERATOR**

ALLIED ENERGY, INC.

_____     _____
Jon Makeever, President     Date

**NON-OPERATOR**

_____     _____
Robert Eringer, Managing Partner     Date
Valentine #3, GP

<u>**EXHIBIT "A"**</u>

1.      **Description of Lands Subject to this Agreement**: Those certain lands identified below.

2.      **Restrictions, if any, as to the Depths, Formations or Substances**: All depths to the Devonian Shale (4,000 feet).

3.      **Parties to Agreement with addresses and telephone numbers for notice purposes:**

Allied Energy, Inc.
Petroleum, West Virginia 26161
Mailing Address: P.O. Box 3005, Saratoga CA 95070
(310) 710-1976
jmm@alliedenergywv.com

Valentine #3, GP
℅ Robert Eringer
1187 Coast Village Road, Suite 1-300
Santa Barbara CA 93108
Phone: (805) 455-5458
E-mail: eringer33@aol.com

4.      <u>Oil and Gas Interest subject to this Agreement</u>: New well Valentine #3 located on Florence Valentine lease in Richie County, West Virginia (API#47-8509965)

5.      Valentine #3 well is subject to royalties of 18.76% and severance tax of 5%

**EXHIBIT "C"**
**ACCOUNTING PROCEDURE JOINT OPERATIONS**

## I. GENERAL PROVISIONS

### 1. Definitions

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached. "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.
"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.
"Operator" shall mean the party designated to conduct the Joint Operations.
"Non-Operators" shall mean the Parties to this agreement other than the Operator.
"Parties" shall mean Operator and Non-Operators.
"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.
"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.
"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.
"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

### 2. INTENTIONALLY OMITTED

### 3. INTENTIONALLY OMITTED

### 4. Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

### 5. Audits

    A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non- Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

    B. The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

### 6. Approval by Non-Operators

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement in which this Accounting Procedure is attached contains no contrary

provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non- Operators shall be controlling on all Non-Operators.


## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. Ecological and Environmental
Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2. Rentals and Royalties
Lease rentals and royalties paid by Operator for the Joint Operations.

3. Material
Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4. Transportation
Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

   A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

   B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

   C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

5. Services
The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

6. Equipment and Facilities Furnished By Operator

   A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed twenty percent (20%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

      B. In lieu of charges in paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

## 7. Damages and Losses to Joint Property

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

## 8. Legal Expense

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgements and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

## 9. Taxes

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

## 10. Insurance

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

## 11. Abandonment and Reclamation

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

## 12. Communications

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

## 13. Other Expenditures

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III.  OVERHEAD

## 1. Overhead – Drilling and Producing Operations

    i.    As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on a fixed rate basis.

    ii.    The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall not be covered by the overhead rates.

iii.   The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property shall not be covered by the overhead rates.

A. Overhead – Fixed Rate Basis

(1)  Operator shall charge the Joint Account at the following rates per well per month: Drilling Well Rate $500.00 (Prorated for less than a full month) Producing Well Rate $500.00

(2)  Application of Overhead - Fixed Rate Basis shall be as follows:

(a)  Drilling Well Rate

(1)  Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b)  Producing Well Rates

(1)  An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2)  Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3)  An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4)  A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5)  All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

B. INTENTIONALLY OMITTED

4. Overhead - Major Construction
To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of $20,000.00:
A. 10% of costs up to $1,000,000, plus
C. 5% of costs in excess of $1,000,000.
Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

5. Catastrophe Overhead
To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence

due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. 10% of total costs up to $1,000,000; plus
C. 5% of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

6. Amendment of Rates
The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. Purchases
Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. Transfers and Dispositions
Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced at market prices.

3. Warranty of Material Furnished By Operator
Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. Periodic Inventories, Notice and Representation
At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. Reconciliation and Adjustment of Inventories
Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. Special Inventories
Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

**EXHIBIT "D"**
**to Joint Operating Agreement**

**INSURANCE PROVISIONS**

Pursuant to Article V, Paragraph D(9) of the Joint Operating Agreement, Operator shall provide the following insurance for the benefit and protection of the joint account:

(1) Statutory Workmen's Compensation Insurance as may be required in the state or states where work under this agreement, or activities relative thereto, will be performed, plus Workmen's Compensation Insurance as may be required by Federal law, if applicable, plus Employer's Liability Insurance.

(2) General liability and 3rd Party property damage insurance (including "Sudden & Accidental" Pollution) with limits of $1,000,000 for each occurrence.

(3) Automobile liability and 3rd party property damage insurance with limits of $1,000,000 combined single limit.

(4) Umbrella liability insurance in the amount of $5,000,000 covering liability of the parties for loss or damage exceeding the insurance coverage specified above or otherwise not covered by insurance maintained by Operator or any third-party contractor.

(5) Operator's OEE in the amount of $5,000,000 Combined Single Limit Coverage for well control and related re-drilling and clean/pollution expenses.

All insurance coverage required hereby shall be carried at the joint expense and for the benefit of the Operator and Non-operator. Premiums for automobile public liability and property damage insurance on Operator's fully owned equipment shall not be charged directly to the joint account, but will be covered by the flat rate charged assessed for the use of such equipment. Operator will not carry fire, windstorm or explosion insurance covering Operations or Equipment. Contractors and subcontractors will be required to carry insurance of the same types as hereinabove specified and in such amount as deemed necessary by Operator. If the parties hereto or any of them shall insure their respective risks beyond the specific limits of insurance required hereunder to be carried by the Operator, the benefits of such insurance shall inure to the parties procuring and maintaining the same, respectively, and the cost of such insurance shall be borne by such parties, respectively, without reimbursement one from the other and without entering into any accounting hereunder.

# EXHIBIT C

Allied Energy, Inc.
Route 1, Box 30-A
Petroleum, West Virginia 26161
Phone:  (304) 628-3672

July 15, 2013

To:  Robert and Elizabeth Eringer, co-Trustees of the Eringer Family Trust U/D/T 3/19/2010

Re:     Participation Agreement

Dear Mr. Eringer:

When properly executed by you, this Participation Agreement will evidence the agreement made and entered into between Allied Energy, Inc., a West Virginia corporation, hereinafter referred to as "ALLIED", and you, hereinafter referred to as "Participant", setting forth the terms and conditions under which ALLIED has agreed to sell and assign to Participant, subject to the burdens and reservations outlined below, an undivided 50% working interest in the new well as known as the Valentine #6 located on the Florence Valentine Lease in Ritchie County, West Virginia, API #47-8510025 (the "Prospect").

I.     **Participant Interest Acquisition**:   Enclosed herewith, ALLIED has submitted invoices for the Authority For Expenditure ("AFE") costs for drilling, hydraulic fracturing and equipping for production ("Drilling and Completion Costs") attributed to this Prospect in the amount of $288,000.00 as specified per the the AFE.   Participant shall pay to ALLIED (the "Operator") upon execution of this Agreement an amount of $288,000.00 to earn in the Prospect a working interest of 50% and net revenue interest of 40.62% (50 x 81.25%).

All other costs after those costs covered by the AFE shall be borne proportionately by ALLIED and Participant.

II.     **New Well**:  ALLIED and Participant have agreed to drill one new well, known as the Valentine #6, to a depth of approximately 4,000 feet within the boundaries of the Florence Valentine Lease in Ritchie County, West Virginia, in accordance with the terms and conditions herein.

Operator hereby agrees to commence, or cause to be commenced, operations for the new well as soon as practical after all funds have been received but no later than thirty (30) days after execution of this Agreement; and once operations are commenced, to prosecute the same with due diligence and in a good and workmanlike manner to a depth as the joint owners may deem necessary to adequately test the previously mentioned formations.   Such well shall be evaluated in accordance with reasonable and prudent Operator standards.    Operator will manage all

engineering services, including drilling and work over rigs, logging, cementing, perforating and any testing of the well drilled on the Prospect.

III.     **INTENTIONALLY OMITTED**

IV.     **Well Information**:  Operator shall furnish regular reports by telephone, fax or e-mail advising of the shows of oil and/or gas encountered and the results of all testing and completion operations. ALLIED shall furnish Participant with sufficient notice prior to the running of any logs, or tests so that Participant and/or its agents may be present for such operations, if Participant so desires.  Additionally, Operator shall furnish Participant one (1) copy of all logs, and one (1) copy of test results, test charts, and West Virginia Department of Mines Oil and Gas Division forms and reports filed in connection with the drilling and completion or plugging and abandonment of the Valentine #6 well.

V.     **Operating Agreement**:  Except as otherwise set forth herein, the rights and obligations agreed to by ALLIED and Participant and all operations shall be governed and controlled by the Joint Operating Agreement in which ALLIED is to be designated as the Operator.  In the event of a conflict between this Participation Agreement and the Joint Operating Agreement, the provisions of this Participation Agreement shall prevail.   Notwithstanding anything to the contrary in the Joint Operating Agreement, the Operator shall market and sell the oil and gas production from the Valentine #6 well on a best price/best terms basis on behalf of itself and the Participant.   Operator on behalf of the Participant shall be responsible for the payment of all royalties, overriding royalties, and other burdens due on the Participant's share of the oil and gas production from the such wells.

VI.     **Assignment**:   Simultaneously with the Participant paying the Drilling and Completion Costs, ALLIED shall assign to Participant 50% interest in the Prospect.  Participant will be delivered a 40.62% net revenue interest in the unit.

VII.     **Land and Legal**:  Any additional run sheets, title opinions, leases, brokerage fees, and outside attorney's fees incurred and required to secure clear title prior to the drilling of the Valentine #6 well shall be billed to the joint account.

VIII.     **Notices**:  All notices, reports and other communications required or necessary by the terms of this Agreement shall be deemed served and addressed if sent by regular mail, overnight express mail, fax, delivery in person or courier service at the addresses stated herein below.  Either party may change addresses by giving prior written notice to the other.  Until further notice, the addresses of the parties to this Agreement are as follows:

Allied Energy, Inc.
Jon M. Makeever
P.O. Box 3005
Saratoga, California 95070
Phone:  (310) 710-1976

WV Office:  (304) 628-3672
E-mail:  jmm@alliedenergywv.com

Eringer Family Trust U/D/T 3/19/2010
℅ Robert Eringer
1187 Coast Village Road, Suite 1-300
Santa Barbara CA 93108
Phone: (805) 455-5458
E-mail: eringer33@aol.com

IX.     **INTENTIONALLY OMITTED**

X.     **Miscellaneous Provisions**:

1.     Participant acknowledges that any and all interest in the Prospect acquired by it hereunder is taken subject to royalties of 18.76% and severance tax of 5%.

2.     ALLIED will indemnify, defend and hold harmless Participant from liability resulting from any claim of personal injury or environmental damage at the Valentine #6 well. Additionally, ALLIED will indemnify, defend and hold harmless Participant from paying in excess of $1,000.00 for any annual operating, maintenance and/or improvement expenses to the Valentine #6 well that exceed its net annual revenues.

3.     If the Valentine #6 well is sold to a third party, Participant will receive from a net sales price a payment in the amount equivalent to their working interest percentage in the Valentine #6 well.

4.     The Participant will not be liable for additional costs beyond the AFE for initial drilling and completion of the Valentine #6 well.

5.     INTENTIONALLY OMITTED

6.     Participant specifically assumes its proportionate share of the risk of description, title, and the condition of the Lease.

7.     This Participation Agreement shall be considered effective upon the execution by both parties of this instrument.   Upon the execution of this Agreement, Participant will be deemed to have assumed and agreed to bear its proportionate share of the duties and obligations set forth in the Operating Agreement.

8.     This Agreement shall not create any mining partnership, commercial partnership, or other partnership, relationship or joint venture, and the responsibilities of each of the parties hereto shall be several and not joint.

9.      This Agreement is entered into in the State of West Virginia, and all matters relating to the validity, construction, interpretation and performance hereunder shall be determined in accordance with the laws of the State of West Virginia.  Venue for any cause of action of whatsoever nature arising hereunder is hereby fixed in Ritchie County, West Virginia.

10.      The provisions hereof shall extend to and be binding upon the parties hereto, their respective successors and assigns, and any transfer or assignment of the interests hereunder shall be expressly subject to the terms and provisions of this Agreement.

If this Agreement correctly states your understanding of our agreement, please signify your acceptance and approval by executing and returning it.

Sincerely,

ALLIED ENERGY, INC.

By:    _____
        Jon M. Makeever, President

ACCEPTED AND AGREED

By:    _____          _____
        Robert Eringer, co-Trustee of the          Date
        Eringer Family Trust U/D/T 3/19/2010

By:    _____          _____
        Elizabeth Eringer, co-Trustee of the          Date
        Eringer Family Trust U/D/T 3/19/2010

# EXHIBIT D

## JOINT OPERATING AGREEMENT

### DATED: July 15, 2013

OPERATOR: Allied Energy, Inc., a West Virginia corporation

CONTRACT AREA:  New Well Valentine #6 (API #47-8510025)

COUNTY OF RITCHIE, STATE OF WEST VIRGINIA

### OPERATING AGREEMENT

THIS AGREEMENT, entered into by Allied Energy, Inc., a West Virginia corporation, hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

### WITNESSETH:

WHEREAS, the Operator is owner of Oil and Gas leases and/or Oil and Gas Interests known as the Florence Valentine Lease located in Richie County, West Virginia and the parties hereto have reached an agreement to explore and develop an Oil and Gas well known as the Valentine #6 described in Exhibit A for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.

### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas wells intended to be developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas wells are described in Exhibit "A."

D. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

E. The term "Oil and Gas Interests" or "Interests" shall mean unleased mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement.

F. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

## ARTICLE II.

## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

A. Exhibit "A," shall include the following information:

(1) Description of lands subject to this agreement,

(2) Restrictions, if any, as to depths, formations, or substances,

(3) Parties to agreement with addresses and telephone numbers for notice purposes,

(4) Percentages or fractional interests of parties to this agreement,

(5) Oil and Gas wells subject to this agreement,

(6) Burdens on production.

B. Exhibit "B," INTENTIONALLY OMITTED

C. Exhibit "C," Accounting Procedure.

D. Exhibit "D," Insurance.

## ARTICLE III.

## INTERESTS OF PARTIES

A. Interests of Parties in Costs and Production:

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, Operator on behalf of all parties shall pay or deliver, or cause to be paid or delivered, all burdens on the production from the Contract Area up to, but not in excess of, 18.75% and shall indemnify, defend and hold the other parties free from any liability therefor. Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden.

## ARTICLE IV.

## TITLES

A. Title Examination:

Title examination shall be made on the proposed Valentine #6 wellsite prior to commencement of drilling operations. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments. Each party contributing Oil and Gas Interests to be included in the Contract Area, if appropriate, shall furnish to Operator all abstracts, title opinions, title papers and curative material in its possession

free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator.  Copies of all title opinions shall be furnished to each party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the parties in the proportion of each party's working interest.

No well shall be drilled on the Contract Area until after (1) the title to the Contract Area, if appropriate, has been examined as above provided, and (2) the title has been accepted by all of the Drilling Parties in such well.

B. Loss or Failure of Title:

Losses:  All losses of Oil and Gas leases or Interests committed to this agreement shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

## ARTICLE V.

## OPERATOR

A. Designation and Responsibilities of Operator:

Allied Energy, Inc. shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

B. Resignation or Removal of Operator and Selection of Successor:

1. Resignation or Removal of Operator:  Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

2. Selection of Successor Operator:  Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after

excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non- Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

C. Employees and Contractors:

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

D. Rights and Duties of Operator:

1. Competitive Rates and Use of Affiliates: The well drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-

Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. Filing and Furnishing Governmental Reports:  Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations:   The following provisions shall apply to the well drilled hereunder, including:
    (a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which drilling operations are commenced.
    (b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.
    (c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates.   Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance:  At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self- insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C."   Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

## ARTICLE VI.

## DRILLING AND DEVELOPMENT

A. Drilling of Valentine #6 Well:

On or before August 16, 2013, Operator shall commence the drilling of the Valentine #6.

B. Other Operations:

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of

Twenty-five Thousand Dollars ($25,000.00) except in connection with the drilling of the Valentine #6 well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of Twenty-five Thousand Dollars ($25,000.00). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as salt water disposal wells or to conduct additional work with respect to the Valentine #6 well drilled hereunder or other similar project reasonably estimated to require an expenditure in excess of Twenty-five Thousand Dollars ($25,000.00).   Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least 51% of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

C. Abandonment of Wells:

    1. Abandonment of Dry Hole:  Any well which has been drilled under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within seventy-two (72) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within forty- eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

    2. Abandonment of Well That Has Produced:  Any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle Operator to retain or take possession of such well and plug and abandon the well.

    Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the wellbore of the

well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the interest of the abandoning party is or includes an Oil and Gas Interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B."  The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

F. Termination of Operations:

Upon the commencement of an operation for the drilling, testing, Completion or plugging of the Valentine #6 well, such operation shall not be terminated without consent of parties bearing 51% of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition and the provisions of Article VI.C. shall thereafter apply to such operation, as appropriate.

**ARTICLE VII.**

**EXPENDITURES AND LIABILITY OF PARTIES**

A. Liability of Parties:

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. No party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

B. Liens:

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

C. Advances: INTENTIONALLY OMITTED

D. Taxes:

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

## ARTICLE VIII.

## ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. Cash Contributions:

While this agreement is in force, any contribution of cash towards the drilling of a well or any other operation on the Contract Area shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation.

B. Assignment; Maintenance of Uniform Interest:

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

E. Waiver of Rights to Partition:

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

## ARTICLE IX.

## INTERNAL REVENUE CODE ELECTION

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership,

and if the parties have not otherwise agreed to form a tax partnership, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulations §  1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

## ARTICLE X.

## CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed Twenty-five Thousand Dollars ($25,000.00) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.

## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.

## NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, facsimile, e-mail, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A."

All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, the facsimile machine of such party or when email is sent by sender. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or upon transmittal by facsimile or e-mail, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, facsimile or e-mail within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

**ARTICLE XIII.**

**TERM OF AGREEMENT**

This agreement shall remain in full force and effect until the Valentine #6 well is abandoned pursuant to Article VI.C.

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

**ARTICLE XIV.**

**COMPLIANCE WITH LAWS AND REGULATIONS**

A. Laws, Regulations and Orders:

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

B. Governing Law:

This agreement and all matters pertaining hereto, including but not limited to matters of performance, nonperformance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of West Virginia shall govern.

C. Regulatory Agencies:

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or

application was made in good faith and does not constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

## ARTICLE XV.

## MISCELLANEOUS

A. Execution:

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Valentine #6 well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Valentine #6 well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds with drilling operations for the Valentine #6 well without the execution hereof by all persons listed on Exhibit "A" as having a current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the Initial Well which would have been charged to such person under this agreement if such person had executed the same and Operator shall receive all revenues which would have been received by such person under this agreement if such person had executed the same.

B. Successors and Assigns:

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

C. Counterparts:

This agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts together constitute only one and the same instrument. Delivery of a counterpart may be made by electronic signature, facsimile transmission or scan and email of a signed copy of this agreement, which transmission shall have the same force and effect as the delivery of an executed original of the agreement. Notwithstanding the foregoing, upon request the parties shall execute and deliver executed copies of this agreement so that each signatory hereof will have a duplicate original executed by the other signatory or signatories.

D. Interpretation:

The terms of this agreement have been negotiated by the parties hereto and the language used in this agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent.  This agreement shall be construed without regard to any presumption or rule requiring construction against the party causing such instrument or any portion thereof to be drafted, or in favor of the party receiving a particular benefit under the agreement.  No rule of strict construction will be applied against any person.

E. Entire Agreement

This agreement, along with the attached exhibits and simultaneously executed Participation Agreement is the entire agreement between the parties with respect to the transaction contemplated herein. It replaces and supersedes any and all oral agreements between the parties, as well as any prior writings.  Neither this agreement nor any provision hereof may be waived, modified, amended, discharged, or terminated except by an instrument in writing signed by the party against which the enforcement of such waiver, modification, amendment, discharge or

termination is sought, and then only to the extent set forth in such instrument.

F. Severability:

    For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

    IN WITNESS WHEREOF, this agreement shall be effective as of July 15, 2013.

ATTEST OR WITNESS:

**OPERATOR**

ALLIED ENERGY, INC.

_____    _____
Jon Makeever, President    Date


**NON-OPERATOR**

_____    _____
Robert Eringer, co-Trustee of the    Date
Eringer Family Trust U/D/T 3/19/2010


_____    _____
Elizabeth Eringer, co-Trustee of the    Date
Eringer Family Trust U/D/T 3/19/2010

## EXHIBIT "A"

1.      **Description of Lands Subject to this Agreement**: Those certain lands identified below.

2.      **Restrictions, if any, as to the Depths, Formations or Substances**: All depths to the Devonian Shale (4,000 feet).

3.      **Parties to Agreement with addresses and telephone numbers for notice purposes:**

Allied Energy, Inc.
Petroleum, West Virginia 26161
Mailing Address: P.O. Box 3005, Saratoga CA 95070
(310) 710-1976
jmm@alliedenergywv.com

Eringer Family Trust U/D/T 3/19/2010
% Robert Eringer
1187 Coast Village Road, Suite 1-300
Santa Barbara CA 93108
Phone: (805) 455-5458
E-mail: eringer33@aol.com

4.      <u>Oil and Gas Interest subject to this Agreement</u>: New well Valentine #6 located on Florence Valentine lease in Richie County, West Virginia (API#47-8510025)

5.      Valentine #6 well is subject to royalties of 18.76% and severance tax of 5%

**EXHIBIT "C"**
**ACCOUNTING PROCEDURE JOINT OPERATIONS**

I. GENERAL PROVISIONS

1. Definitions

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached. "Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.
"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.
"Operator" shall mean the party designated to conduct the Joint Operations.
"Non-Operators" shall mean the Parties to this agreement other than the Operator.
"Parties" shall mean Operator and Non-Operators.
"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.
"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.
"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.
"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

2. INTENTIONALLY OMITTED

3. INTENTIONALLY OMITTED

4. Adjustments

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

5. Audits

      A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

      B. The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6. Approval by Non-Operators

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement in which this Accounting Procedure is attached contains no contrary

provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non- Operators shall be controlling on all Non-Operators.


## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

### 1. Ecological and Environmental
Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

### 2. Rentals and Royalties
Lease rentals and royalties paid by Operator for the Joint Operations.

### 3. Material
Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

### 4. Transportation
Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

    A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

    B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

    C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

### 5. Services
The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

### 6. Equipment and Facilities Furnished By Operator

    A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed twenty percent (20%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

      B. In lieu of charges in paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

## 7. Damages and Losses to Joint Property

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

## 8. Legal Expense

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgements and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

## 9. Taxes

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

## 10. Insurance

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

## 11. Abandonment and Reclamation

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

## 12. Communications

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

## 13. Other Expenditures

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III.  OVERHEAD

## 1. Overhead – Drilling and Producing Operations

    i.    As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on a fixed rate basis.

    ii.    The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property shall not be covered by the overhead rates.

      iii.   The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property shall not be covered by the overhead rates.

A. Overhead – Fixed Rate Basis

      (1)  Operator shall charge the Joint Account at the following rates per well per month: Drilling Well Rate $500.00 (Prorated for less than a full month) Producing Well Rate $500.00

      (2)  Application of Overhead - Fixed Rate Basis shall be as follows:

      (a)  Drilling Well Rate

         (1)  Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

         (2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

      (b)  Producing Well Rates

         (1)  An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

         (2)  Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

         (3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

         (4)  A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

         (5)  All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

B. INTENTIONALLY OMITTED

4. Overhead - Major Construction
To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of $20,000.00:
A. 10% of costs up to $1,000,000, plus
C. 5% of costs in excess of $1,000,000.
Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

5. Catastrophe Overhead
To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence

due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. 10% of total costs up to $1,000,000; plus
C. 5% of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

6. Amendment of Rates
The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. Purchases
Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. Transfers and Dispositions
Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced at market prices.

3. Warranty of Material Furnished By Operator
Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. Periodic Inventories, Notice and Representation
At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. Reconciliation and Adjustment of Inventories
Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. Special Inventories
Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

**EXHIBIT "D"**
**to Joint Operating Agreement**

**INSURANCE PROVISIONS**

Pursuant to Article V, Paragraph D(9) of the Joint Operating Agreement, Operator shall provide the following insurance for the benefit and protection of the joint account:

(1) Statutory Workmen's Compensation Insurance as may be required in the state or states where work under this agreement, or activities relative thereto, will be performed, plus Workmen's Compensation Insurance as may be required by Federal law, if applicable, plus Employer's Liability Insurance.

(2) General liability and 3rd Party property damage insurance (including "Sudden & Accidental" Pollution) with limits of $1,000,000 for each occurrence.

(3) Automobile liability and 3rd party property damage insurance with limits of $1,000,000 combined single limit.

(4) Umbrella liability insurance in the amount of $5,000,000 covering liability of the parties for loss or damage exceeding the insurance coverage specified above or otherwise not covered by insurance maintained by Operator or any third-party contractor.

(5) Operator's OEE in the amount of $5,000,000 Combined Single Limit Coverage for well control and related re-drilling and clean/pollution expenses.

All insurance coverage required hereby shall be carried at the joint expense and for the benefit of the Operator and Non-operator. Premiums for automobile public liability and property damage insurance on Operator's fully owned equipment shall not be charged directly to the joint account, but will be covered by the flat rate charged assessed for the use of such equipment. Operator will not carry fire, windstorm or explosion insurance covering Operations or Equipment. Contractors and subcontractors will be required to carry insurance of the same types as hereinabove specified and in such amount as deemed necessary by Operator. If the parties hereto or any of them shall insure their respective risks beyond the specific limits of insurance required hereunder to be carried by the Operator, the benefits of such insurance shall inure to the parties procuring and maintaining the same, respectively, and the cost of such insurance shall be borne by such parties, respectively, without reimbursement one from the other and without entering into any accounting hereunder.